UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL ELECTION COMMISSION,    )
    )
        Plaintiff,    )
    )
      v.    )    Case No. 8:06-cv-00068-SDM-EAJ
    )
CONSTANTINE KALOGIANIS, et al.,    )
    )
        Defendants.    )

**PLAINTIFF FEDERAL ELECTION COMMISSION'S
OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Thomasenia P. Duncan
Acting General Counsel
tduncan@fec.gov

Richard B. Bader
Associate General Counsel
rbader@fec.gov

Colleen T. Sealander
Assistant General Counsel
csealander@fec.gov

Robert W. Bonham III
Senior Attorney
rbonham@fec.gov

Claire N. Rajan
Attorney
crajan@fec.gov

March 23, 2007    For the Plaintiff
FEDERAL ELECTION
COMMISSION
999 E Street, N.W.
Washington, D.C.  20463
(202) 694-1650
(202) 219-0260 (facsimile)

# TABLE OF CONTENTS

**Page**

ARGUMENT ……………………………………………………………. 2

I.     THE LOANS WERE MADE USING CORPORATE FUNDS
       PROHIBITED BY SECTION 441b, NOT "PERSONAL FUNDS" ……. 2

II.    2 U.S.C. 441b IS CONSTITUTIONAL AS APPLIED TO THE
       CORPORATE CONTRIBUTIONS MADE TO THE
       KALOGIANIS COMMITTEE ………………………………………. 10

III.   DEFENDANTS VIOLATED 2 U.S.C. 434(b) BY FILING FALSE
       REPORTS ………………………………………………………… 14

IV.    THIS COURT SHOULD IMPOSE A CIVIL PENALTY SIZEABLE
       ENOUGH TO DETER THE TYPES OF VIOLATIONS FOUND,
       AND INJUNCTIVE RELIEF TO PROHIBIT THE REPETITION OF
       SUCH VIOLATIONS BY DEFENDANTS ……………………………. 15

       A.  The Statue Authorizes A 100% Civil Penalty For Non-Willful
           Violations ……………………………………………………… 17

       B.  In Assessing A Civil Penalty, This Court Should Follow The
           Statutory Scheme, Rather Than Defendants' 10% Formula ………… 20

       C.  Permanent Injunction Prohibiting Similar Violations Is
           Warranted ……………………………………………………… 25

CONCLUSION …………………………………………………………... 28

# TABLE OF AUTHORITIES

**Cases**

Athens Lumber Co., Inc. v. FEC, 531 F.Supp. 756, 758 (M.D. Ga 1982),
  rev'd, 689 F.2d 1006 (11th Cir. 1982), rh'g, 718 F.2d 363 (11th Cir. 1983)
  (en banc), cert denied 465 U.S. 1092 ........................................................................11

Atlas Roofing Co. v. OSHRC, 518 F.2d 990 (5th Cir. 1975) ......................................25
  aff'd, 430 U.S. 442 (1977)

Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990) ............10, 11, 12, 13

Avirgen v. Hull, 932 F.2d 1572 (11th Cir. 1991) ..........................................................2

Bashir v. AMTRAK, 119 F.3d 929 (11th Cir. 1997) ....................................................10

Buckley v. Valeo, 424 U.S. 1 (1976) ..............................................................11, 12, 15

Callahan v. Schultz, 783 F.2d 1543 (11th Cir. 1986) ....................................................9

CFTC v. Hunt, 591 F.2d 1211 (7th Cir. 1979) ............................................................28

CFTC v. Int'l Berkshire Group Holdings, Inc., No. 05-6158, 2006 WL 3716390
  (S.D. Fla. Nov. 3, 2006) ........................................................................................26

CFTC v. Sidoti, 178 F.3d 1132 (11th Cir. 1999) ........................................................27

EEOC v. Waffle House, Inc., 534 U.S. 279 (2002) ......................................................27

FEC v. Beaumont, 539 U.S. 146 (2003) ........................................................11, 13, 14

FEC v. Citizens for Senator Wofford, 1996 U.S. Dist. LEXIS 21501 (M.D. Pa) ........21

FEC v. Democratic Senatorial Campaign Committee, 1:95-cv-2881-MHS,
  at 2 (N.D. Ga) (Jul. 8, 1997) ................................................................................21

FEC v. Friends of Jane Harman, 59 F. Supp. 2d 1046 (C.D. Cal. 1999) ..........15, 21, 23

FEC v. Furgatch, 869 F.2d 1256 (9th Cir. 1989) ....................................................21, 27

FEC v. Massachusetts Citizens for Life, 479 U.S. 238 (1986) ..................10, 11, 12, 13

FEC v. National Rifle Ass'n of America, 553 F. Supp. 1331 (D.D.C. 1983) ..............22

FEC v. National Rifle Ass'n of America, 254 F.3d 173, 185 (D.C. Cir. 2001) .............2

FEC v. National Republican Senatorial Committee,
    761 F. Supp. 813 (D.D.C. 1991) .............................................................................21

FEC v. National Right to Work Committee, 459 U.S. 197 (1982)...............................10

FEC v. Ted Haley Congressional Committee, 852 F.2d 1111 (9th Cir. 1988)...2, 15, 23

FEC v. Toledano, 317 F.3d 939 (9th Cir. 1999) ..........................................................21

First National Bank of Arizona v. Cities Serv. Co., 391 U.S. 253 (1968).....................2

Hecht v. Bowles, 321 U.S. 321 (1944) .........................................................................27

International Union (UAW) v. NLRB, 459 F.2d 1329 (D.C. Cir. 1972).........................9

Legal Environmental Assistance Corp. v. EPA, 276 F.3d 1253 (11th Cir. 2001)..........2

Leigh v. Warner Brothers, 212 F.3d 1210 (11th Cir. 2000) ..........................................9

McConnell v. FEC, 540 U.S. 93 (2003) .......................................................................13

McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988).............................................19

Nixon v. Shrink Missouri Government PAC, 528 U.S. 377 (2000) .......................13, 14

Rapanos v. United States, 547 U.S. __, 126 S.Ct. 2208 (2006).....................................9

SEC v. Carriba Air, Inc., 681 F.2d 1318 (11th Cir. 1982)...........................................27

SEC v. Management Dynamics, Inc., 515 F.2d 810 (2d Cir. 1975) .............................26

SEC v. Spence & Green Chemical Co., 612 F.2d 896 (5th Cir. 1980)........................27

Sene X Eleemosynary Corp., 479 F. Supp. 970 (S.D. Fla. 1979).......................... 26-27

Torres v. INS, 144 F.3d 472 (7th Cir. 1998)................................................................19

United States v. UAW-CIO, 352 U.S. 567 (1957)........................................................11

United States v. E.I. du Pont de Nemours & Co., 366 U.S. 316 (1964) .......................16

United States v. ITT Continental Baking Corp., 420 U.S. 223 (1975).........................25

United States v. Gonzalez, 520 U.S. 1 (1997) ...............................................................5

United States v. Morton Salt Co., 338 U.S. 632 (1950) ...............................................12

United States v. Oakland Cannabis Buyers' Cooperative, 523 U.S. 483 (2001)..........16

United States v. W.T. Grant Co., 345 U.S. 629 (1953) ......................................... 26-27

**Statutes and Regulations**

Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. 107-155, 116 Stat. 81 (2002)...............................................................................................................................4

2 U.S.C. 431(8)(B)(vii).................................................................................................5

2 U.S.C. 432(e)(2)..........................................................................................................5

2 U.S.C. 437f ...............................................................................................................18

2 U.S.C. 437g(a)(6)(B) ...............................................................17, 20, 25, 26, 27

2 U.S.C. 437g(a)(6)(C) ................................................................................................17

2 U.S.C. 437g(d)(1)(A) (2000) ...................................................................................17

2 U.S.C. 441a .............................................................................................................3, 4

2 U.S.C. 441a(a)(1)(A) .................................................................................................4

2 U.S.C. 441b ........................................................................................................passim

11 C.F.R. 100.7(b)(11)............................................................................................5, 18

11 C.F.R. 101.2 ..............................................................................................................5

11 C.F.R. 102.7(d) .........................................................................................................5

11 C.F.R. 110.10 .....................................................................................................2, 3, 4

11 C.F.R. 110.10(a).........................................................................................................3

11 C.F.R. 110.10(b) .......................................................................................................5

11 C.F.R 110.10(b)(1)....................................................................................................3

11 C.F.R. 111.24(a)(1) (2000) ....................................................................................20

**Miscellaneous**

Advisory Opinion 1994-26 ....................................................................................5, 6, 7

MUR 3987 (Hughes Aircraft Co.) ..............................................................................21

MUR 5388 (Treffinger) ..............................................................................................22

MUR 5390 (Freddie Mac) ..........................................................................................22

MUR 5675 (ARMPAC)...............................................................................................22

FEC Press Release, <u>FEC Posts Record Year, Collecting $6.2 Million In Civil
    Penalties</u> (Dec. 28, 2006) ............................................................................22

H.R. Conf. Rep. No. 1057, 94th Cong., 2d Sess. 47 (April 28, 1976) <u>reprinted in</u>
    FEC, <u>Legislative History of the Federal Election Campaign Act Amendments
    of 1976</u> (1977)...........................................................................................26

Webster's Third New International Dictionary 97 (1976)............................................5

As the Commission demonstrated in its opening brief, based on the affidavits, documentary evidence, official agency records and evidentiary and judicial admissions made by the Defendants, there is no genuine dispute that the corporate defendants made six loans and in-kind contributions in the form of free office space and furniture to Mr. Kalogianis's campaign committee.  With regard to the Commission's allegation that Defendants violated the Federal Election Campaign Act ("Act" or "FECA") reporting provisions, Defendants now effectively concede that they violated those requirements of the Act by reporting those loans as if they had come from Mr. Kalogianis directly, and by misreporting the dates on which two loan refunds were made.[1]

While these facts establishing violations of the Act are not seriously disputed on the evidence in the record, Defendants have tried to obfuscate them with a variety of arguments that lack legal basis and evidentiary support.  As the Commission explains below and in its Response to Defendants' Statement of Material Facts[2] filed today, while Defendants' characterization of the facts may differ from the Commission's, any such dispute is not genuine because Defendants rely almost entirely on unsupported conclusory factual assertions, legal conclusions phrased as

---

[1]    Indeed, just yesterday Defendants suddenly filed twenty-five new and amended disclosure reports, in which they identify the corporations as the source of five of the loans, after years of refusing to take any such remedial action.  These new reports mischaracterize the Liberty Title line of credit yet again, however, this time as a loan from Wells Fargo to the campaign committee, rather than from Liberty Title Agency, Inc. ("Liberty Title" or "Liberty")  See p. 14-15, infra.

[2]    Citations to "FEC Exhibit xxx" are to the exhibits accompanying the FEC's Motion for Summary Judgment and this Opposition.  Citations to "FECxxxxx" are to Bates-numbered pages within the Commission's exhibits.  An updated Table of Exhibits and conversion table (FEC Bates-number to FEC Exhibit number) are provided as FEC Appendix A.

Citations to "Facts" are to the FEC's Statement of Material Facts (Docket # 41-1) and citations to "Def. Facts" are to the Defendants' Statement of Material Facts (Docket # 40-1).

References to "MUR" refers to a "Matter Under Review," which is the Commission's term for matters during the administrative enforcement proceeding.

1

factual assertions, and claims that are contradicted by the record.  It is black letter law that such

materials are insufficient to avoid summary judgment.   First National Bank of Arizona v. Cities

Serv. Co., 391 U.S. 253, 289 (1968); Avirgen v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).   As

a result, the Court should deny Defendants' summary judgment motion and grant summary

judgment to the Commission, because on the evidence in the record there is no genuine issue that

Defendants violated the Act in the manner alleged by the Commission, and the Commission is

entitled to judgment as a matter of law.

## ARGUMENT

### I.    THE LOANS WERE MADE USING CORPORATE FUNDS PROHIBITED BY SECTION 441b, NOT "PERSONAL FUNDS"

The Commission explained in its opening brief (at 19) that while candidates are free to

use bona fide salary and dividends they receive from corporations for their campaigns, the

Commission has consistently concluded that corporate assets do not otherwise qualify as

"personal funds" under the Commission's regulation at 11 C.F.R. 110.10, even when the

corporation is owned by the candidate.  See generally id. at 17-22.  Time and time again, in

advisory opinions and enforcement actions over the past thirty years, the Commission has

decided that a candidate's use of his own corporation's assets violates the Act's prohibition

against corporate contributions that broadly applies to "any corporation whatever."  See Br. at

20-22.  The Commission's construction of the Act is entitled to traditional Chevron deference,

FEC v. National Rifle Ass'n of America, 254 F.3d 173, 185 (D.C. Cir. 2001); FEC v. Ted Haley

Congressional Comm., 852 F.2d 1111 (9th Cir. 1988), and its construction of its own "personal

funds" regulation is entitled to "controlling weight . . . "unless it is plainly erroneous or

inconsistent with the regulation." Legal Environmental Assistance Corp. v. EPA, 276 F.3d 1253,

1262 (11th Cir. 2001) (internal citations omitted).  See also FEC Br. at 21.

2

Instead of admitting that the Commission has, without fail, construed the Act and its own regulations otherwise for nearly thirty years and providing some sort of explanation for why this Court should not afford the Commission's interpretation of its own statute and regulations the substantial deference it is due, Defendants adopt their own construction of 110.10(a) that permits Mr. Kalogianis to use his corporation's assets without limit, and they claim that a single Commission advisory opinion demonstrates that Mr. Kalogianis's use of his corporations' lines of credit was proper.  Defendants first assert that because Mr. Kalogianis "wholly owns and controls" Kalogianis & Associates and Liberty Title Agency, Inc., "[t]hese financial resources easily fit within the regulatory definition of assets to which he had a 'legal and rightful title,' or an 'equitable interest,'" Def. Br. at 10.  Relying on Mr. Kalogianis's assertion at deposition that as an "officer of these corporations" he "could have transferred the funds from my corporate account into my personal accounts" (id.), and the claim that he "personally controlled and guaranteed the Wells Fargo BusinessLine [account]" (id.), Defendants then declare that because Mr. Kalogianis was a corporate officer, who had "control" over the assets and lines of credit of the corporations, the requirements of Section 110.10 are met.  Id at 11.

It is not surprising that Defendants cite no legal precedent for considering Mr. Kalogianis's role as a corporate officer in determining whether he had the requisite "legal right of access to or control over" the funds under Section 110.10(b)(1).  Section 110.10 does not even refer to, much less create an exception to, the prohibition on corporate contributions in 2 U.S.C. 441b, or to its explicit language making it illegal for "any officer or any director of any corporation . . . to consent to any contribution . . . by the corporation . . . prohibited by this section."  Section 110.10 implements 2 U.S.C. 441a, which imposes contribution limits such as the $1,000 limit on the amounts that an individual, other than the candidate himself, may

3

contribute to federal candidates.[3]  Section 110.10 merely clarifies the contribution and

expenditure limits imposed in Section 441a by stating that those limits do not apply when the

candidate makes a contribution of his own money to his campaign.  Indeed, that is why the

Commission placed it in Part 110 of the regulations, which implements the Act's general

contribution limits and prohibitions, rather than in Part 114 where the regulations implementing

Section 441b are codified.

There is nothing in the text or history of the regulation suggesting that the Commission's

"personal funds" regulation was intended to override Section 441b's proscription against

corporate officers consenting to the contribution of corporate funds, where the corporate officer

is a candidate.  Under Mr. Kalogianis's construction, any candidate who holds stock in a

corporation and also serves as a corporate officer with a "legal right of access to or control over"

corporate funds would be entitled to contribute whatever portion of the corporation's assets

represented his "equitable interest" in the corporation to his campaign.  Such an interpretation

would eviscerate Section 441b's general proscription on the contribution and expenditure of

corporate funds, and it would contravene the explicit statutory provision that makes it illegal for

a corporate officer to "consent" to a corporate contribution.  Thus, while Defendants complain

(Br. 12) that "the FEC" says "a candidate for federal office cannot use his personal resources to

challenge an incumbent [if] those resources [are] held" in a wholly-owned corporation, it is

actually Section 441b of the statute that provides this since it explicitly applies to the assets of

---

[3]      As mentioned in the FEC's opening brief (Br. 3, n.2), all the facts occurred prior to the
effective date of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. 107-155, 116
Stat. 81 (2002).  Under the Act as modified by BCRA, the individual contribution limit is
currently $2,200.  2 U.S.C. 441a(a)(1)(A).  Accordingly, unless specified, all citations to the Act
or statements regarding provisions of the Act in this brief refer to the Act as it existed prior to the
effective date of BCRA.  Similarly, all citations to the Commission's regulations or statements
regarding any particular regulations refer to the 2002 edition of Title 11, Code of Federal
Regulations, published prior to the Commission's promulgation of regulations under BCRA.

"any corporation whatever" and all candidates, challengers and incumbents alike.  See <u>United States v. Gonzalez</u>, 520 U.S. 1, 5 (1997) ("[T]he word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind") (quoting Webster's Third New International Dictionary 97 (1976)).

Defendants assert (Br. 10-11) that Commission Advisory Opinion 1994-26 supports Mr. Kalogianis's use of the Wells Fargo line of credit, but that opinion involved a candidate's <u>personal</u> lines of credit, not a corporate line of credit such as the one provided by Wells Fargo, so that opinion is simply inapplicable to the Section 441b violation at issue here.  Moreover, the Commission emphasized in that opinion that even a personal loan to a candidate for use in his campaign can only be accepted from a "state bank, a Federally chartered depository institution, or a depository institution whose deposits and accounts are insured by the Federal Deposit Insurance Corporation," <u>id</u>. at 1 (citing 11 C.F.R. 100.7(b)(11) and 2 U.S.C. 431(8)(B)(vii)).  The two corporations, the original source of five of the loans, were neither banks nor lending institutions, and thus were not permitted by the Act to lend funds to a campaign committee. [4]

---

[4]     Defendants assert (Br. 11) that in a footnote to this opinion the Commission "found" that the funds from the lines of credit "belonged to the candidate as a gift," which is one of the permissible sources of personal funds under Section 110.10(b), and then go on to argue that in this case, "the funds loaned to [the Kalogianis Committee] were at least as accessible to Mr. Kalogianis as a gift, salary, or dividend from his corporations."  The Commission, however, did not conclude that even personal lines of credit are gifts, and explicitly stated in the opinion that "an availability of funds from a line of credit . . . does not meet the definition of personal funds under Commission regulations at 11 C.F.R. 110.10(b) . . . ."  Indeed, the Commission did not regard the loans as having been made to the candidate, but instead analyzed their permissibility as if they were made directly to the Committee, because when a candidate personally obtains a loan for use in connection with his or her campaign, the candidate receives the loan as an agent of the committee.  AO 1994-26 at 1 n.1 (citing 2 U.S.C. 432(e)(2); 11 C.F.R. 101.2 and 102.7(d)).  Such loans are reportable and itemizable as loans from the bank to the committee, rather than as loans from the candidate to the committee.

The Commission cited the personal funds regulation only by analogy in considering whether the lines of credit had been obtained by the candidate in contemplation of running for office, or had been granted by the banks knowing of his candidacy.  Because the lines of credit

The advisory opinion goes on to explain that any campaign loan must be "made in the ordinary course of business," which means that it bears the usual and customary rate of interest of the lending institution for the category of the loan involved, is evidenced by a written instrument, and is subject to a due date or amortization schedule.  There is no evidence in this case that any interest was required or paid on the five loans the Kalogianis Committee received directly from the corporations, that there was any sort of written agreement for any of those loans, or that any had a due date for repayment or an amortization schedule.  FEC Facts at 111.

The Wells Fargo loan would not have satisfied the requirements of this Advisory Opinion either, even if it had been a personal loan instead of a business loan to a corporation, as Wells Fargo Operations Weber John Weber testified that it was.  See Weber Decl. at ¶ 5 [229].  Like the other corporate loans, there is no evidence that this loan had either a due date or an amortization schedule.  Moreover, Advisory Opinion 1994-26 specifies that a loan must meet the Commission's standard for assurance of repayment, which requires either (1) traditional collateral, (2) a perfected security interest, (3) other sources of repayment, such as future income, that are properly assigned under the regulations, or (4) such other repayment assurances as the Commission may approve on a case-by-case basis.  Id. at 2.  Wells Fargo Operations Manager Weber testified that this loan was unsecured, so despite Defendants' misleading claim that it was "guaranteed by [Mr. Kalogianis's] assets" (Br. 12), Wells Fargo had neither the perfected

---

long pre-dated the requestor's candidacy, the Commission analogized them to "gifts of a personal nature that have been customarily received prior to candidacy" in concluding that two of the three lines of credit were "made in the ordinary course" of the banks' businesses.  In contrast, all six of the corporate loans at issue here post-dated Mr. Kalogianis's candidacy, and the Wells Fargo line of credit was obtained after Mr. Kalogianis had decided to run for office.  Moreover, Kalogianis & Associates and Liberty Title Agency are not accredited banking institutions, and there is no evidence that Mr. Kalogianis had any history of obtaining loans from these corporations for any other purpose.  In none of these essential features do the corporations' loans resemble those permitted in AO 1994-26.

security interest nor the assignment of future income that the advisory opinion states is required for even a personal campaign loan to be permissible under the Act. See Weber Decl. at ¶ 10 [229]. Indeed, the Wells Fargo loan was not even listed on Mr. Kalogianis's credit report as a personal debt owed by him. FEC Resp. to Def. Facts at 24.

Advisory Opinion 1994-26 also addresses the requirements for reporting for public disclosure the terms and conditions of loans that candidates or their committees take out for the purpose of providing funds to their campaigns, none of which Defendants followed in this case. The Commission explained that "when a candidate or political committee obtains a loan, or establishes a line of credit," the committee must report the date and amount of the loan or line of credit, the interest rate and repayment schedule of each loan or draw on the line of credit, and the details of the basis of repayment, and must also file a copy of the loan or line of credit agreement when it first receives funds. AO 1994-26 at 3. The regulations require a certification from the lending institution attesting to the terms and conditions the committee reports, and stating that the loan or line of credit was made or established on terms and conditions no more favorable than those for similar credit granted to borrowers of comparable credit. Id. The Kalogianis Committee, however, amended its reports to state falsely that the last two loans were made by Mr. Kalogianis when in fact they were made by the corporations, and either falsely reported or failed to report almost all of this required information for all six of the loans, despite repeated requests from the Commission by letter and telephone over the course of several years that it do so. See FEC Facts at 62, 73, 74, 80, 81, 97, 104, 111, 112. In sum, if, as the Defendants suggest (Br. 12 n.4), they actually relied upon Advisory Opinion 1994-26, it would have provided them a detailed explanation of why their transactions were not in compliance with the law.

As we have shown, Defendants' arguments for concluding that the corporate loans to the Kalogianis Committee met the Commission's "personal funds" requirement, their arguments also rest largely upon conclusory factual assertions that are contrary to the evidence.  For example, it is simply untrue as Defendants assert (Br. 12), that "[a]nother way of saying the same thing about the $27,000 Wells Fargo BusinessLine loan is that the loan was from the bank to the campaign."  In fact, Defendants never gave Wells Fargo any reason to suspect that the money from the Wells Fargo BusinessLine was being diverted from Liberty Title to Kalogianis's campaign committee, and Wells Fargo Vice President Weber testified that this type of loan is only available to businesses.  See Weber Decl. ¶ 9 [229].  Since this was a business loan to a corporation it is also not true, as Defendants assert (Br. 12), that Mr. Kalogianis, "not Liberty, used the funds and was obligated to repay the funds" – Liberty was the primary obligor for repayment of the funds and Mr. Kalogianis was only a guarantor for Liberty's loan.  See Weber Decl. ¶ 10 [229].

We have shown that it is not true that "Liberty was not only dormant but incapable of functioning" (Def. Br. 12); Liberty made two other loans from its own bank accounts to the Kalogianis Committee, it filed annual reports for the next three years after the loans occurred, and more than $16,000 passed through its operating account, just a few months after November 2000, when Defendants say that Liberty's assets were sold.  FEC Facts ¶ 29-31.  Indeed, in December 2000 Mr. Kalogianis attested in the Wells Fargo loan application that Liberty Title still had substantial funds in its bank accounts and did not suggest that the corporation on whose behalf he was seeking a business line of credit was "incapable of functioning" (Def. Br. 12) as a result of selling its assets a month earlier.  FEC Facts at 32.[5]

---

[5]        Contrary to Defendants' assertion (Br. 16), it is not an undisputed fact that Mr.

Finally, Defendants' assertion (Br. 12) that "KFC repaid [Mr. Kalogianis] and he repaid the bank" is belied by the evidence.  According to the cancelled checks and bank records, the Kalogianis Committee repaid the original $27,000 drawn on the line directly to Wells Fargo, in a check made payable to the bank, and the committee made several interest payments on the subsequent $29,000 draw directly to Wells Fargo in the same manner.  FEC Facts at 88-90.  With these examples in mind, the Court should approach Defendants' many conclusory factual assertions skeptically, and be particularly careful not to accept those that are not supported by actual evidence in the record.[6]

---

Kalogianis in fact could have qualified for a personal loan in the amount that his corporations loaned to the campaign -- $54,528 – or that Kalogianis & Associates "could have paid [him] a bonus, dividend, salary or used other mechanisms" to provide him money.  But these factual assertions are also purely speculative and unsupported by evidence, such as a showing that Mr. Kalogianis had sufficient personal assets to qualify for a loan of that size.  It is, however, an undisputed fact that none of these alternative ways of converting corporate assets into Mr. Kalogianis's "personal funds" were used in this case.  Thus, even if they had been supported by evidence, such claims are nothing more than "the familiar tactic of substituting the purpose of the statue for its text, freeing the Court to write a different statute that achieves the same purpose." Rapanos v. United States, 547 U.S. __, 126 S.Ct. 2208, 2234 (2006).  Moreover, Mr. Kalogianis and Ms. Jones testified at deposition that the decision to loan the campaign the bulk of the money was made only a few days before the close of the reporting period, and that there would not have been sufficient time for Mr. Kalogianis to obtain the money in any other way in time for the campaign to show the desired financial strength on its 2001 Mid-Year disclosure report.  See CK Depo. [252] at 140-141 ("We could have gone to a bank.  We didn't have enough time.  We only had a few days . . .").

[6]     Although Defendants analogize (Br. 11) the corporate funds to a "salary or dividend" to Mr. Kalogianis, there is no objective evidence to support the notion that any such salary or dividends were owed.  Although Ms. Jones testified that the loans "would have been shown" on the corporate books and tax returns as a "distribution" to Mr. Kalogianis (Def. Facts ¶ 20), Defendants have never produced any corporate records, ledgers, tax returns, or any other documents to prove the truth of this statement.  The Court of Appeals has "consistently held that conclusory allegations without specific supporting facts have no probative value," Leigh v. Warner Brothers, 212 F.3d 1210, 1217 (11th Cir. 2000) (citation omitted), and under this Circuit's adverse inference rule, "when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." Callahan v. Schultz, 783 F.2d 1543, 1545 (11th Cir. 1986) (citing International Union (UAW) v. NLRB, 459 F.2d 1329, 1336 (D.C. Cir. 1972)).  Moreover, as we describe in more detail in ¶ 20

## II.     2 U.S.C. 441b IS CONSTITUTIONAL AS APPLIED TO THE CORPORATE CONTRIBUTIONS MADE TO THE KALOGIANIS COMMITTEE

As we explained in our opening brief (Br. 22), the Supreme Court has held that the ban on corporate contributions in Section 441b serves the compelling governmental interests of preserving the integrity of the electoral system and avoiding corruption and the appearance of corruption of the electoral process.  The Supreme Court explained the constitutionally sufficient justification for prohibiting corporate contributions and expenditures in FEC v. Massachusetts Citizens for Life ("MCFL"), 479 U.S. 238, 257 (1986):

> [w]e have described that rationale . . . as the need to restrict the influence of political war chests funneled through the corporate form . . . , to eliminate the effect of aggregated wealth on federal elections . . . , to curb the political influence of those who exercise control over large aggregations of capital . . . , and to regulate the substantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization.

(internal citations omitted).  Thus, "[t]he statute reflects a legislative judgment that the special characteristics of the corporate structure require particularly careful regulation," FEC v. National Right to Work Committee ("NRWC"), 459 U.S. 197, 209-210 (1982), which has led the Supreme Court to find constitutional a prohibition on independent expenditures by most corporations, as well as contributions, Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 658-660 (1990), even though it has found limits on independent expenditures by those other than

of our Response to Defendants' Statement of Facts, the Commission sought Defendants' tax returns during discovery, and they refused to provide them, citing an inapplicable privilege. Under a second adverse inference rule, an "adverse inference is drawn from a party's failure to preserve evidence []when the absence of that evidence is predicated on bad faith."  See Bashir v. AMTRAK, 119 F.3d 929, 929 (11th Cir. 1997).  It is beyond dispute that Defendants have control over the corporate records of Kalogianis & Associates and Liberty Title Agency, and if there were anything contained in those records to support Ms. Jones's assertion, they were obligated to provide it to the Court and to produce it to the Commission during discovery. Moreover, it appears that Defendants destroyed some records while this litigation has been ongoing.  As a result, this Court should conclude that the records would not support Defendants' claims.

corporations and unions to be unconstitutional.  Buckley v. Valeo, 424 U.S. 1, 50 (1976).  As we

have demonstrated (Br.  23-24), courts have repeatedly upheld the application of Section 441b to

contributions by corporations of every kind, including non-profit organizations, see, e.g., FEC v.

Beaumont, 539 U.S. 146 (2003),[7] and those that are closely held, like the ones in this case.  See

Athens Lumber Co., Inc. v. FEC, 531 F.Supp. 756, 758 (M.D. Ga 1982), rev'd, 689 F.2d 1006

(11th Cir. 1982), rh'g, 718 F.2d 363 (11th Cir. 1983) (en banc), cert denied 465 U.S. 1092

(1984) (directors and shareholders of this closely-held corporation unanimously voted to make

the contribution).  In fact, no court has ever held Section 441b unconstitutional as applied to any

kind of corporate contribution even though this prohibition has been the law of the land for 100

years.[8]

Defendants ignore the Supreme Court's recognition that the corporate form itself is

properly subject to this special restriction on contributions and expenditures, and instead ask this

Court to conclude that Mr. Kalogianis is not likely to be corrupted here because he is the

candidate, a corporate officer, and allegedly the only stockholder in these corporations.

However, if quid-pro-quo candidate corruption were the only interest supporting Section 441b,

as Defendants argue, the Supreme Court would not have found such a prohibition constitutional

as applied to independent expenditures.

---

[7]     In MCFL, 479 U.S. at 263-264, the Supreme Court found the prohibition on independent
expenditures unconstitutional as applied to a small class of non-profit issue advocacy
organizations, but in Beaumont the Court found the prohibition on contributions constitutional,
even as applied to that same class of corporations.  Defendants could not rely on MCFL even if
this case involved independent expenditures, however, because the contributions in this case
were from for-profit business corporations.

[8]     When the prohibition of corporate contributions was first adopted, "[a]lthough some
congressional proposals would have 'prohibited political contributions by [only] certain classes
of corporations . . . Congress acted on the President's call for a outright ban, not with half
measures."  Beaumont, 539 U.S. 146, 152 (internal citations omitted) (quoting United States v.
UAW-CIO, 352 U.S. 567, 585 (1957)).

> Regardless of whether this danger of "financial quid pro quo" corruption … may be sufficient to justify a restriction on independent expenditures, [a statutory prohibition on corporate campaign expenditures] aims at a different type of corruption in the political arena:  the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas.

Austin, 494 U.S. at 659-660 (citation omitted).

> State law grants corporations special advantages -- such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets -- that enhance their ability to attract capital and to deploy their resources in ways that maximize the return on their shareholders' investments. These state-created advantages not only allow corporations to play a dominant role in the Nation's economy, but also permit them to use 'resources amassed in the economic marketplace' to obtain 'an unfair advantage in the political marketplace.'

Id. at 658-659 (quoting MCFL, 479 U.S. at 257).  Corporations are, therefore, "endowed with public attributes.  They have a collective impact upon society, from which they derive the privilege of acting as artificial entities" and such "[f]avors from government often carry with them an enhanced measure of regulation."  United States v. Morton Salt Co., 338 U.S. 632, 652 (1950).  This "unique state-conferred corporate structure that facilitates the amassing of large treasuries warrants the limit on independent expenditures," and "[c]orporate wealth can unfairly influence elections when it is deployed in the form of independent expenditures" or "assumes the guise of political contributions."  Austin, 494 U.S. at 660.

Defendants rely (Br. 8) upon the ruling in Buckley, 424 U.S. at 58, that statutory provisions limiting the amount a candidate (or any other individual) spends of his or her own money to advocate an election result were unconstitutional.  However, Buckley did not consider the constitutionality of Section 441b, and it said nothing about a candidate having a constitutional right in any circumstance to use unlimited amounts of corporate money to finance his or her campaign.  In Austin, however, the Supreme Court addressed the question of corporate

12

funds and <u>upheld</u> a prohibition on independent expenditures using corporate funds.  Moreover, in doing so, it confirmed that its rationale for upholding the prohibition of corporate contributions and expenditures based upon the particular concerns about money accumulated through the corporate form of business, is fully applicable to closely held business corporations like the ones in this case.

> Although some closely held corporations, just as some publicly held ones, may not have accumulated significant amounts of wealth, they receive from the State the special benefits conferred by the corporate structure and present the potential for distorting the political process.  This potential for distortion justifies [the statutory prohibition's] applicability to all corporations.

Beaumont, 539 U.S. at 158 (quoting Austin, 494 U.S. at 661 (emphasis added)).

Accordingly, regardless of what standard of review this Court would apply if the constitutionality of Section 441b's prohibition of corporate contributions were still an open question,[9] the Supreme Court has already upheld that provision based on reasoning that is fully applicable to the corporations that contributed to Mr. Kalogianis's campaign, and those decisions are controlling here.[10]

---

[9]   Defendants' argument (Br. 15) for strict scrutiny of this statutory restriction on contributions has repeatedly been rejected by the Supreme Court.  All contribution restrictions indirectly affect expenditures by reducing the amount of money that may be available to a spender, but a candidate's mere lack of additional funds to spend on advocacy no more violates his First Amendment rights when it results from contribution restrictions than when it results from his obligation to pay some of his money in taxes.  The Supreme Court, therefore, "drew a line between expenditures and contributions, treating expenditure restrictions as direct restraints on speech …, which nonetheless suffered little direct effect from contribution limits."  Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 386 (2000) (citations omitted).  See also, e.g., id. at 387 ("We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending'") (quoting MCFL, 479 U.S. at 259-60); McConnell v. FEC, 540 U.S. 93, 137 (2003) ("[t]he less rigorous standard of review we have applied to contribution limits . . . shows proper deference to Congress' ability to weigh competing constitutional interests in an area in which it enjoys particular expertise").

[10]   Since the prohibition of corporate campaign contributions has already been found constitutional, there is no need for the Commission to provide any new evidence to support it, as

## III.   DEFENDANTS VIOLATED 2 U.S.C. 434(b) BY FILING FALSE REPORTS

As we have already demonstrated (Br. 26-28), after initially reporting the loans as having been made by the corporations, the Kalogianis Committee and its treasurer violated the Act's reporting provision by falsely amending their reports to state that Mr. Kalogianis, rather than the corporations, made two of the loans at issue after the Commission pointed out to them that the corporate loans they had reported would violate the Act.  Defendants also falsely reported that two of the loans were repaid in December 2002 when they were in fact repaid a year earlier.  The Committee and its treasurer, until yesterday, refused to correct these reports, despite being told to do so repeatedly by the Commission over the course of the past five years.

Defendants have not disputed that they did not comply with the statute's reporting requirements.  Although Defendants assert that "[s]ubsequent amendment to the reports identifying Mr. Kalogianis as the source of the loans merely confirmed who was providing funds to KFC,"  Defendants later admit (Br. 27) that the information in their amendments was "incorrect," adding that Mr. Kalogianis has "never denied that the campaign violated § 441b." While they do not even attempt to argue that these false reports comply with the statutory provisions they are charged with violating, Defendants claim (Br. 20-21) that their false reports still satisfy the purposes of the statute.  Even if it were plausible that reporting false information could somehow satisfy the Congressional purpose of accurately informing the public about candidates' actual campaign finances, the courts enforce statutes as written by Congress, not

---

Defendants assert it should (Br. 18).  In <u>Nixon v. Shrink Missouri Government PAC</u>, 528 U.S. 377 (2000), on which Defendants rely (Br. 19), the Supreme Court explained that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."  <u>Id</u>. at 391.  With regard to the corporate contribution prohibition in Section 441b, the Supreme Court did not find any new evidence necessary to decide that "[j]udicial deference is particularly warranted where, as here, we deal with a congressional judgment that has remained essentially unchanged throughout a century of careful legislative adjustment."  <u>Beaumont</u>, 539 U.S. at 162, n.9 (internal citation omitted).

some alternate requirement that a defendant might think would have served Congress' purposes just as well.  See n. 5, supra.  In any event, the reports plainly did not provide the electorate with information as to where political campaign money came from and how it was spent, because they state falsely that Mr. Kalogianis, not the corporations, was the source of the money.  They did not serve the interest in "exposing large contributors . . . to the light of publicity," Buckley, 424 U.S. at 67, because the Committee and its treasurer did not identify the actual contributors.  Finally, the false amended reports would preclude anyone from "gather[ing] the data necessary to detect violations of the contribution limits," id., because they falsely state that the contributions came from Mr. Kalogianis, rather than from the corporations which actually provided the funds in violation of Section 441b.  Thus, contrary to Defendants' claim, the false reports they filed serve none of the compelling governmental purposes served by the statute's requirement of accurate and timely disclosure of campaign finances to the public, but have served only to mislead the public about the actual source of Mr. Kalogianis's campaign funds.  Since there is no dispute that Defendants violated the Act's reporting requirements, the Court should enter summary judgment on that issue against the Defendants.

**IV.    THIS COURT SHOULD IMPOSE A CIVIL PENALTY SIZEABLE ENOUGH TO DETER THE TYPES OF VIOLATIONS FOUND, AND INJUNCTIVE RELIEF TO PROHIBIT THE REPETITION OF SUCH VIOLATIONS BY DEFENDANTS**

Defendants argue (Br. 21-29) that the Court should impose no remedy whatever – no civil penalty and no injunction – for any violations it finds them to have committed in this case.  While Defendants cite two cases from the Ninth Circuit in support of the argument that a court finding violations need not provide any remedy,[11] the Supreme Court has more recently made

---

[11]    In FEC v. Ted Haley Congressional Committee, 852 F.2d 1111 (9th Cir. 1988) and FEC v. Friends of Jane Harman, 59 F. Supp. 2d 1046 (C.D. Cal. 1999), the courts imposed no civil penalty or injunction despite finding that the defendants had violated the Act as alleged.

clear that a court's remedial discretion is not that broad.  "A district court cannot . . . override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited," and "[o]nce Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is  . . . for the courts to enforce them when enforcement is sought."  United States v. Oakland Cannabis Buyers' Cooperative, 532 U.S. 483, 497 (2001) (citation omitted).  Absent contrary statutory language, a court's choice in formulating a remedy "is simply whether a particular means of enforcing the statute should be chosen over another permissible means; [its] choice is not whether enforcement is preferable to no enforcement at all."  Id. (emphasis added).  Moreover, "[i]t is well settled that once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor."  United States v. E.I. du Pont de Nemours & Co., 366 U.S. 316, 334 (1961).

In selecting a remedy, therefore, the Court should be guided by the provisions of the statute and by a consideration of what remedy, or combination of remedies, would best enforce the requirements of the Act in the circumstances of this case.  Defendants do not address those questions, arguing instead that the violations here were not willful and the Court should, therefore, restrict a civil penalty to no more than 10% of the contributions at issue (without mentioning that the statute explicitly authorizes a penalty for non-willful violations equal to 100% of the amount of any contributions involved).  As we have shown in our opening brief, and elaborate below, the circumstances of this case call for a much higher civil penalty than 10%, if it is to serve as an effective deterrent to candidates tempted to skirt the law in the future to serve their own political ambitions.  This case also calls for an injunction against repetition of these violations by the Defendants, who continue to insist they are entitled to engage in this type of

activity, and have repeatedly resorted to insubstantial legal arguments and factual assertions

belied by the record to avoid all liability for their relatively blatant violations of the Act.

### A.  The Statue Authorizes A 100% Civil Penalty For Non-Willful Violations

Defendants argue at length that no civil penalty is warranted because their violations

were not willful, and were committed with good motives.  As a legal matter, this argument is

belied by the three different levels of remedies set out in the penalty provisions of the Act, which

Defendants entirely ignore.  Section 437g(a)(6)(B), which is the provision cited in the

Complaint, authorizes the Court to impose a civil penalty up to the greater of $5,500 or the

amount of the contribution involved for each violation of the Act that is found, without regard to

scienter or intent.  If the Court finds that a violation of the Act is "knowing and willful," Section

437g(a)(6)(C) authorizes a civil penalty double the amount permitted for a non-willful violation:

the greater of $11,000 or twice the amount of the contribution involved.  Finally, a person

prosecuted criminally for "knowingly and willfully" violating any provision of the Act involving

"the making, receiving, or reporting of any contribution or expenditure aggregating $2,000 or

more" can be fined up to the greater of $25,000 or 300% of the contribution involved, and

imprisoned for up to one year.  2 U.S.C. 437g(d)(1)(A) (2000).[12]  Thus, Congress has already

expressly provided for the measurement of a civil penalty in terms of the amount of money

involved and the willfulness of the respondent, and the statute explicitly provides for a civil

penalty up to 100% of the amount of money involved in any "contribution" for a violation that is

not willful.  There is no legal basis for the Court to ignore the penalty level explicitly authorized

by the statute for a non-willful violation, on the grounds that the violation at issue was not

willful.

---

[12]      This provision was amended in 2002, but the amendments took effect after the violations
in this case occurred.

In any event, as a factual matter, the record does not support any claim that Defendants tried in good faith to comply with the statute. According to the Defendants (Br. 27), they consulted the Commission's Campaign Guide for Congressional Candidates and Committees to determine whether the loans were permissible, but the guide is explicit about the statute's corporate contribution prohibition applying to all corporations. The guide instructs that "[c]ampaigns may not accept contributions made from the general treasury funds of corporations . . . This prohibition applies to <u>any</u> incorporated organization, including a nonstock corporation, an incorporated membership organization and an incorporated cooperative." FEC Ex. 533 at 17 (emphasis added). Defendants concede they understood from this that contributions from other corporations were prohibited (Br. 3), but the candidate guide makes no distinction between "third party" corporations and any other type of corporation. FEC Ex. 533 at 17.[13]

As a practicing attorney, Mr. Kalogianis knew how to research legal rules, find relevant precedents (such as the advisory opinions discussed on pp. 17, 20, and 21 of our opening brief), and seek advice from a government agency (see 2 U.S.C. 437f), if he had really wanted to find out what the law required. Instead, he chose the convenient path of "assum[ing]" (see n. 13, <u>supra</u>) that what he wanted to do to advance his political ambitions would be permissible, despite the fact that the Commission campaign guide, which he admits consulting, clearly indicated it was not. "Ignorance of a statute is generally no defense even to a criminal prosecution, and it is

---

[13]     Mr. Kalogianis testified: "I actually recall seeing something in the handbook where bank loans were allowed. I then assumed I could make loans from my companies to the campaign as a result." FEC SMF ¶ 64; CK Depo. [252] at 173. But, Mr. Kalogianis was well aware that his corporations are not banks. Moreover, the candidate guide clearly specifies that "[a] <u>candidate</u> or his or her committee may obtain a loan, including a loan of credit, from a bank, <u>provided</u> that the loan: bears the bank's usual and customary interest rate for the category of loan involved; is evidenced by a written instrument; is subject to a due date or amortization schedule; and is made on a basis which assures repayment (see below). 100.7(b)(11)." FEC Ex. 533 at 18 (emphasis in original). As we have discussed, <u>supra</u>, pp. 5-7, none of the loans at issue here satisfied these requirements.

never a defense in a civil case, no matter how recent, obscure or opaque the statute." Torres v. INS, 144 F.3d 472, 474 (7th Cir. 1998).  A lawyer who knows that a statute is applicable to his actions, but chooses not to find out how it is actually applied, certainly cannot successfully argue that he made a good faith effort to comply with the law.  Cf. McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988) (a violation is "willful" if defendant "either knew or showed reckless disregard as to whether its conduct was prohibited by [the statute]").

Moreover, by December 2001, the Commission had specifically called to Ms. Jones's attention that contributions from the corporations were prohibited and that funds provided by the corporations to the campaign were not Mr. Kalogianis's "personal funds" under the regulations. FEC SMF ¶ 80.  Defendants' response was to amend their reports to represent falsely that Mr. Kalogianis, rather than the corporations, had made the loans that were outstanding at that time, and they engaged in a purported "refund" of those loans that simply rerouted the same corporate money back to the campaign through Mr. Kalogianis's personal bank accounts, all in a single day.  See FEC Br. at 7-8; FEC Facts at 88-96.  This evidences an effort to evade the Act's requirements by covering up the corporate source of the money, rather than a good faith effort to bring themselves into compliance with the law.

Defendants assert (Br. 21) that they used the corporations' funds with the innocent motive of avoiding corrupting Mr. Kalogianis with contributions from others, but this is belied by Mr. Kalogianis's own testimony that he actually authorized the corporate loans in order to induce others to make contributions to his campaign.

> The issue was showing strength to get the attention of the important people who could then parlay that to maybe getting some party support, because the party has their targeted races.  And if you're not on their radar screen, you don't get any support from the party and you don't get support from the entities, like the PACs, that look to the party, to say should we give to this candidate.

CK Depo. [252] at 139.  Indeed, Mr. Kalogianis explained that the reason the corporations made

loans, rather than direct contributions, was to enable the campaign to repay the corporations later

using money raised from others.  "We set it up as loans so that if I prevailed, the hope would be

that someday I could get repaid that money," CK Depo. [252] at 51.  In short, the Defendants'

claim to this Court that Mr. Kalogianis's motive was to make sure "that nobody owned [him]" is

thoroughly impeached by his own testimony to the contrary.[14]

> **B.**  **In Assessing A Civil Penalty, This Court Should Follow The Statutory Scheme, Rather Than Defendants' 10% Formula**

As we have explained, the Act authorizes the Court to impose a civil penalty for non-

willful violations, for each defendant, up to the greater of (i) $5,500 for each violation or (ii) the

amount of any contributions or expenditures involved in each violation.  See 2 U.S.C.

437g(a)(6)(B); 11 C.F.R. 111.24(a)(1) (2000).  The maximum civil penalty the Act authorizes

the Court to assess for all of the violations alleged in this case is almost $300,000.  See FEC Ex.

513.  This figure includes penalties for making, consenting to, and accepting, six prohibited

corporate contributions totaling more than $54,000; for making, consenting to, and accepting

prohibited in-kind corporate contributions; and for falsely reporting the sources of two of the

loans and the dates of the repayment of two others.

The appropriate civil penalty is certainly a matter within this Court's discretion, but as

shown above, the touchstones for calculating a penalty are the remedial provisions of the Act and

the need to punish violators adequately and to deter similar violations by Defendants and others

---

[14]     Defendants suggest (Br. 26) that there is something unconventional about finding a violation of both the Act's corporate contribution prohibition and its reporting requirement. Almost none of the cases Defendants cite involve reporting violations, however, and in none of them did the defendants falsely amend their reports to cover up the source of a loan after being questioned about it by the Commission, as Defendants did here.

with similarly overriding political ambitions.  Ignoring these decisive factors entirely,

Defendants argue (Br. 26) that their selective review of civil penalties awarded in some of the

Commission's enforcement cases over the past twenty years establishes a rule of thumb limiting

civil penalties to 10% of the contributions involved.  However, none of those decisions purport

to follow any such 10% rule (which would conflict with the statute's own 100% penalty

standard) and each of these decisions turned on the particular facts and circumstances before the

court. [15]   In other cases, courts have imposed civil penalties between 75% and almost 100% of

the amounts in violation.  See, e.g., FEC v. Furgatch, 869 F.2d 1256, 1259 (9th Cir. 1989) (the

court assessed a $25,000 penalty for a disclosure violation, which was eight dollars short of the

expenditure involved); FEC v. Toledano, 317 F.3d 939, 953 (9th Cir. 2002) (upholding a $7,500

penalty for a $10,000 violation,[16] noting this was "quite generous to Toledano in light of his

admitted misdeeds").

More relevant to this Court's deliberations than the old decisions cited by Defendants is

the contemporaneous level of civil penalties that have been paid for similar violations in recent

---

[15]     For example, unlike FEC v. Citizens for Senator Wofford, 1996 U.S. Dist. LEXIS 21501
(M.D. Pa) (applying the Act's contribution limits to a special election called after the death of a
Senate candidate) or FEC v. National Republican Senatorial Committee, 761 F. Supp. 813, 824
(D.D.C. 1991) (noting that "this is a matter of first impression" on which the Commission was
initially "divided [in a 3-3 tie] over the meaning of its own regulation"), this case does not
involve an issue of first impression or a point of law that was previously unclear.  As we have
demonstrated, the prohibition of all corporate contributions has been in effect for a century and
the Commission has a thirty-year record of applying it to candidate-owned corporations.  There
is also no claim in this case, as there was in FEC v. Democratic Senatorial Campaign Committee
("DSCC"), 1:95-cv-2881-MHS, at 2 (N.D. Ga.) (July 8, 1997), that Mr. Kalogianis's opponent
was treated more favorably by the Commission for a "substantially similar violation" and thus
there is no reason to reduce the civil penalty on that basis.  It is also noteworthy that, while the
court imposed no civil penalty on the candidate in Harman (see supra n.11, p.15, the corporation
that had facilitated individual contributions to her campaign paid a $45,000 civil penalty in
administrative conciliation.  See MUR 3987 (Hughes Aircraft Co.) [FEC Ex. 530].

[16]     Defendants' brief incorrectly states (Br. 25) that the court imposed a $7,000 penalty.

years.   See, e.g., FEC MUR 5675 (ARMPAC) [FEC Ex. 526] ($115,000 civil penalty for

reporting violations during the 2002 election cycle); MUR 5390 (Freddie Mac) [FEC Ex. 527]

($3.8 million civil penalty for making prohibited corporate contributions); and MUR 5388

(Treffinger) [FEC Ex. 528] ($171,000 civil penalty for campaign committee's failure to refund

$227,080 in excessive contributions before paying legal fees).   See also FEC Press Release, FEC

Posts Record Year, Collecting $6.2 Million In Civil Penalties (Dec. 28, 2006) [FEC Ex. 529].   If

civil penalties imposed after full litigation and adjudication in court are not appreciably higher

than those arrived at through the statutory procedure of voluntary conciliation, the Commission's

ability to administer and enforce the Act effectively through the conciliation process -- "the

preferred method of dispute resolution under FECA," FEC v. National Rifle Ass'n of America,

553 F. Supp. 1331, 1338 (D.D.C. 1983) -- will be severely undermined.

Defendants argue (Br. 26, emphasis added) that their good faith is shown because they

"initially reported the loans correctly as coming from corporations [and] candidly admitted the

substance of the transactions to the FEC RAD analyst"[17] (emphasis added).   See also Br. 27 ("All

of the loans were reported to the FEC and the public more than a year before the election").

Such an assertion completely ignores Defendants' subsequent effort to amend that report to

cover up the fact that the loans had come from corporations, their reporting of the loans as

having been made by Mr. Kalogianis personally in their subsequent reports, and their refusal to

correct the reports to state that the loans were from the corporations, until just yesterday.

---

[17]   Defendants' claim (Br. 27) that "amendments were filed pursuant to the advice of the
FEC RAD analyst" has no citation to the record and no support for it.  As the Commission's
official records demonstrate, FEC RAD analysts requested over and over that the Kalogianis
Committee file amendments to its reports to clarify the source and to disclose the terms of the
loans and the details of the repayments, to no avail.  FEC Facts at 62, 73, 74, 80, 81, 97, 104,
111, 112.

Defendants also argue (Br. 27) that no penalty is warranted because "[t]he loans could have been made in a manner that did not violate 441b(a) wit[h] the same funds at issue in this case." As discussed <u>supra</u>, n. 6, p. 9, Defendants produced no evidence at all to support the assertion that Mr. Kalogianis was in fact owed salary or dividends by his corporations at the time he needed the funds, or that he could have obtained a loan of this size personally from a bank. That alone distinguishes this case from <u>Harman</u>, in which the Commission explicitly "concede[d] that with only modest modifications, the events . . . would have been perfectly legal." 59 F.Supp.2d at 1057. Defendants assert (Br. 26-27) that they remedied their violations immediately by "refund[ing] most of the contributions as funds became available." Unlike the candidate in <u>Haley</u>, however, who promptly corrected the illegal excessive loan guarantees he had received by paying off the guaranteed bank loan with his own personal funds, 852 F.2d at 1116, Defendants only created the appearance of refunding the illegal corporate contributions, which they funneled back to the campaign the same day after routing them through the corporations' and Mr. Kalogianis's bank accounts. <u>See</u> p. 19, <u>supra</u>.

Finally, in their effort to convince the Court that no meaningful monetary deterrent should be imposed, Defendants allege facts that are simply not true. There is no truth, for example, to Defendants' remarkable claim (Br. 27) that Mr. Kalogianis "has never denied that the campaign violated 441b." Before this Court, Defendants have not only vociferously denied violating Section 441b, but have also moved to amend their Answer and Rule 36 admissions to deny the undeniable underlying facts they previously admitted -- that the loans were actually made to the campaign using corporate funds and a corporate line of credit. Defendants therefore deserve no credit for acquiescing in the Commission's view of the law, as they suggest (Br. 26), since they are actually continuing to resist that view of the law adamantly before this Court.

Even worse is Defendants' assertion (Br. 7-8) that Mr. Kalogianis attempted to settle the matter during the administrative proceeding but the Commission's staff acted in bad faith during conciliation by "refus[ing] to lower the amount of the fine they would recommend that the Commission accept" after he provided evidence that only $11,000 of the $42,000 loan made in June 2001 were from corporate funds.  The evidence actually shows that the Commission initially offered in pre-probable cause conciliation a civil penalty totaling $64,000, divided equally between the corporations and Mr. Kalogianis as a corporate officer and director on the one hand, and the Kalogianis Committee, Ms. Jones as treasurer, and Mr. Kalogianis as the candidate, on the other.  FEC Ex. 522 at 1.  After Mr. Kalogianis provided evidence that $31,000 of the $42,000 actually came from his personal account, rather than from the corporation, the Commission staff cut their civil penalty offer by more than half, reducing it to a total of $31,000 for all of the Defendants.  FEC Ex. 521 at 1.  Despite the Commission's flexibility, Mr. Kalogianis adamantly refused to offer more than $15,000, and also refused to admit in an agreement that any of the Defendants had violated Section 441b.  See FEC Ex. 522, 524.[18]

In sum, Defendants have provided no legitimate reason for this Court not to impose a substantial penalty for their violations.  Civil penalties must be high enough to punish violators adequately and deter the Defendants and others with similar overriding political ambitions from trying to circumvent the Act.  Civil penalties assessed to enforce statutory schemes enacted by

---

[18]     A discounted civil penalty of $31,000 was offered in the early stage of the administrative proceeding as an incentive to settle the matter without a full investigation or further proceedings before the Commission.  FEC Ex. 521.  After the Commission had investigated the matter, the General Counsel had briefed the case, and the Commission had made probable cause findings, the Commission again proposed conciliation, and after withdrawing the discount to induce early settlement, the Commission's conciliation offer at that stage of proceedings was $60,000.  FEC Ex. 523.  As noted supra, p. 22, the imposition of lower civil penalties even later, after a respondent has continued to resist enforcement through full litigation, would be an incentive to respondents not to settle in conciliation.

Congress should "inflict a pocket-book deterrence."  <u>Atlas Roofing Co. v. OSHRC</u>, 518 F.2d

990, 1001 (5th Cir. 1975), <u>aff'd</u>, 430 U.S. 442 (1977).  According to the Defendants (Br. 3-4),

Mr. Kalogianis willingly spent $169,000 of his own money "that will never be repaid" in pursuit

of his political ambitions.  The Court should take that into account in deciding just how much of

a civil penalty is required to deter Mr. Kalogianis from violating the Act again should he run for

office in the future.  A person willing to commit that much money to achieving his political

ambitions is not likely to be deterred by a judgment requiring the payment of only $20,000 or

$30,000 more.  To serve the purposes of enforcing the Act, a civil penalty in this case must be

large enough to ensure that it will not be considered by the Defendants as an "acceptable cost" of

doing business.  <u>See</u> <u>United States v. ITT Continental Baking Corp.</u>, 420 U.S. 223, 231 (1975).

### C.    Permanent Injunction Prohibiting Similar Violations Is Warranted

The Act specifically provides that a district court "may grant a permanent or temporary

injunction, restraining order, or other order, including a civil penalty . . . upon a proper showing

that the person involved has committed, or is about to commit (if the relief sought is a permanent

or temporary injunction or a restraining order), a violation of this Act."  2 U.S.C. 437g(a)(6)(B).

Although Defendants admit (Br. 28) that a "district court can exercise its discretion to issue an

injunction pursuant to [2 U.S.C. 437g(a)(6)(B)] if there is a likelihood of future violations," they

also claim (Br. 29) that a permanent injunction can only be issued if the Defendants are "about to

violate the law" again, and that a finding of a past statutory violation is not enough.

This argument is contrary to the statutory language.  Congress chose to authorize

"permanent" injunctions in the provision of the Act that is applicable to non-willful violations,

rather than limiting them to cases involving knowing and willful violations of the law.  The Act

plainly provides that the Court may issue a permanent injunction "upon a proper showing that

the person has committed, or is about to commit" a violation of this Act, 2 U.S.C. 437g(a)(6)(B)

(emphasis added), and the Conference Report explained that this language was intended to

ensure, inter alia, that "[t]he relief sought in any civil action may include a permanent . . .

injunction," H.R. Conf. Rep. No. 1057, 94th Cong., 2d Sess. 47 (April 28, 1976) (emphasis

added), reprinted in FEC, Legislative History of the Federal Election Campaign Act

Amendments of 1976 at 1041 (1977) [FEC Ex. 525].  Thus, Defendants' claim that the

Commission must provide evidence that they are "about to violate" the Act in order for this

Court to issue a permanent injunction is contrary to the plain language and the legislative history

of the Act.  It is no wonder that they have found no precedent construing the statute as containing

such a restriction on a court's remedial authority.[19]

Courts have long recognized that a finding of a statutory violation is itself sufficient to

support a permanent injunction because such a finding "is highly suggestive of a likelihood of

future violations."  See SEC v. Management Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975);

CFTC v. Hunt, 591 F.2d 1211, 1220 (7th Cir. 1979).  See also CFTC v. Int'l Berkshire Group

Holdings, Inc., No. 05-6158, 2006 WL 3716390, at *11 (S.D. Fla. Nov. 3, 2006).  "Once the

government establishes the existence of the statutory violation, the burden shifts to the

Defendants to show that 'there is no reasonable expectation that the wrong will be repeated.'"

Sene X Eleemosynary Corp., 479 F. Supp. 970, 981 (S.D. Fla. 1979) (quoting United States v.

---

[19]   Although Defendants do not really explain their assertion that the language of the Act
only permits a permanent injunction where a Defendant is "about to commit" a violation of the
Act, it may be based on a misunderstanding of the role of the parenthetical contained in 2 U.S.C.
437g(a)(6)(B)-- "(if the relief sought is a permanent or temporary injunction or restraining
order)."  As a full reading of the statutory provision makes clear, that phrase does not restrict the
Court's authority to issue such relief to instances where a defendant is "about to commit" a
violation.  It specifies instead that when a Defendant "is about to" commit a violation, only
injunctive relief is authorized, and not civil penalties, which are permitted only when a defendant
already "has committed" a violation of the Act.

W.T. Grant Co., 345 U.S. 629, 633 (1953)).  Mere cessation of unlawful activities is not grounds, in and of itself, to deny a statutory injunction, particularly where "such cessation arises only as a result of official pressure or threatened litigation."  Id.

Defendants also rely (Br. 28-29, n.8) on Furgatch, 869 F.2d at 1262, in claiming that only a finding of "extraordinary intransigence and hostility toward the FEC and the Act" would authorize a permanent injunction.  However, that argument conflicts with the plain language of the Act, other federal regulatory regimes that provide for injunctive relief, and recent Supreme Court cases.  As we have already explained supra at pp. 25-26, Congress explicitly provided in Section 437g(a)(6)(B) for permanent injunctions even for non-willful violations of the Act.  Moreover, the FECA is not the only statute that relies upon injunctions as a major enforcement tool.  More than sixty years ago, the Supreme Court noted that most federal regulatory statutes provide for enforcement by injunction.  Hecht v. Bowles, 321 U.S. 321, 327-29 (1944).  Both before and after Furgatch was decided by the Ninth Circuit, the rule in the Eleventh Circuit was that district courts have discretion to issue a permanent injunction against repetition of proven violations of law so long as there is a reasonable "likelihood" that the wrong will be repeated.  See CFTC v. Sidoti, 178 F.3d 1132, 1137 (11th Cir. 1999); SEC v. Carriba Air, 681 F.2d 1318, 1322 (11th Cir. 1982); SEC v. Spence & Green Chemical Co., 612 F.2d 896, 903 (5th Cir. 1980).  To the extent that the Furgatch court purported to create a new rule for the Ninth Circuit that forbids permanent injunctions in a class of cases for which the statute explicitly authorizes them, the Supreme Court has rejected such an approach.  A court is not permitted "to announce a categorical rule precluding an expressly authorized form of relief as inappropriate in all cases."  EEOC v. Waffle House, Inc., 534 U.S. 279, 291 (2002).

Finally, Defendants have not made any objective showing that it is unreasonable to expect that they will violate the Act again.  Indeed, it has long been recognized that an injunction is warranted where, as here, "a violator has continued to maintain that his conduct was blameless . . . . "  CFTC v. Hunt, 591 F.2d 1211, 1220 (7th Cir. 1979).  As Mr. Kalogianis asserted just six months ago:

> This was my money, and there's nothing anybody can ever say to ever tell me otherwise.  You cannot tell me that a company that I own a hundred percent – that I then make a decision to use that money i[n] a manner in which I personally see fit, is somehow not my money.  You cannot tell me that, but you are.  So here we are.

FEC SMF ¶ 67.  Mr. Kalogianis continues to this day to insist that he is entitled to engage in this activity, which is explicitly prohibited by the Act, and he continues his tenacious resistance to being held responsible for his violations and to taking any action whatever to remedy them.  In such circumstances, the public is surely entitled to the assurances provided by an injunction that does nothing more than forbid the Defendants from engaging in the same sort of unlawful activity in the future.

## CONCLUSION

For the foregoing reasons, and those set out in the initial brief, the Commission respectfully submits that this Court should deny the Defendants' motion for summary judgment, grant the Commission's motion for summary judgment, and impose a substantial civil penalty and a permanent injunction as remedies for the violations of law at issue.

Respectfully submitted,


*/s/ Thomasenia P. Duncan*
tduncan@fec.gov
Thomasenia P. Duncan
Acting General Counsel

/s/ Richard B. Bader
rbader@fec.gov
Richard B. Bader
Associate General Counsel

/s/ Colleen T. Sealander
csealander@fec.gov
Colleen T. Sealander
Assistant General Counsel

/s/ Robert W. Bonham III
rbonham@fec.gov
Robert W. Bonham III
Senior Attorney

/s/ Claire N. Rajan
crajan@fec.gov
Claire N. Rajan
Attorney

For the Plaintiff
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C.  20463
(202) 694-1650
(202) 219-0260 (facsimile)

March 23, 2007

## __Certificate of Service__

I hereby certify that on March 23, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:  Stephen E. Hershkowitz and Charles H. Lichtman, counsel for Defendants.

I further certify that I e-mailed the foregoing document and the notice of electronic filing to the following non-CM/ECF participant:  Neil Reiff.

*/s/ Claire N. Rajan*
Claire N. Rajan
 Attorney
crajan@fec.gov
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C.  20463
(202) 694-1650
(202) 219-0260 (facsimile)