UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL ELECTION COMMISSION,

    Plaintiff,

v.                                        Case No: 8:06-cv-68-T-23EAJ

CONSTANTINE KALOGIANIS, et al.,

    Defendants.
_____/

## **ORDER**

The Federal Election Commission (the "Commission") is an independent agency of the United States government with jurisdiction over the interpretation, administration, and civil enforcement of the Federal Election Campaign Act (the "Act"). 2 U.S.C. §§ 431-455. The Commission is authorized to investigate a possible violation of the Act and to initiate a civil action in United States district court to enforce the Act. 2 U.S.C. §§ 437d(e), 437g(a)(6).

Constantine Kalogianis ("Kalogianis") was a candidate for the United States House of Representatives for the Ninth Congressional District of Florida in the 2002 Democratic primary election and the November, 2002, general election (Doc. 41, Ex. 1 ¶¶ 3-5). Kalogianis & Associates, P.A. ("Kalogianis & Associates") is a law firm organized as a Florida for-profit corporation (Doc. 41, Ex. 1 ¶ 15; Doc. 40, Ex. 1 ¶ 3). Kalogianis is an officer of Kalogianis & Associates (Doc. 41, Ex. 1 ¶ 16; Doc. 40, Ex. 1 ¶ 3). Liberty Title Agency, Inc., ("Liberty Title") was a Florida for-profit corporation

founded in July, 1995 (Doc. 41, Ex. 1 ¶ 23; Doc. 40, Ex. 1 ¶ 4).  Kalogianis was an officer and director of Liberty Title (Doc. 41, Ex. 1 ¶ 24).  Kalogianis for Congress, Inc., ("Kalogianis Committee" or "Committee") was the principal campaign committee for Kalogianis in the 2002 elections (Doc. 41, Ex. 1 ¶ 8; Doc. 40, Ex. 1 ¶ 7).

On February 21, 2001, Kalogianis filed a "Statement of Candidacy" with the Commission and designated the Kalogianis Committee as his campaign committee (Doc. 41, Ex. 1 ¶ 3).  Kalogianis' wife, Kathy Kalogianis, was the initial treasurer of the Kalogianis Committee but Patricia Jones ("Jones") served as treasurer of the Kalogianis Committee since June 27, 2001 (Doc. 41, Ex. 1 ¶¶ 8-9; Doc. 40, Ex. 1 ¶ 12).  Jones also serves as the accountant for Constantine and Kathy Kalogianis, Kalogianis & Associates, and Liberty Title (Doc. 41, Ex. 1 ¶¶ 10-11; Doc. 40, Ex. 1 ¶ 11).

## **THE STATUTORY AND REGULATORY FRAMEWORK**

In connection with an election for federal office, the Act prohibits a corporation's offering a contribution and a candidate's accepting the corporation's contribution. 2 U.S.C. §§ 441b(a), 441b(b)(2); 11 C.F.R. §§ 114.2(a)–(b).  Section 441b states that "[i]t is unlawful . . . for any corporation whatever . . . to make a contribution . . . in connection with any election at which . . . a Senator or Representative in . . . Congress [is] to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices."  2 U.S.C. § 441b(a). The Act also prohibits any officer or director of a corporation from consenting to a contribution and prohibits "any candidate, political committee, or other person" from

knowingly accepting a contribution by a corporation in connection with an election for federal office.  2 U.S.C. § 441b(a).

A corporate contribution includes "any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value . . . to any candidate, campaign committee, or political party or organization, or any other person" in connection with any primary or general election for Congress.  2 U.S.C. §§ 441b(a), (b)(2); 11 C.F.R. § 114.1(a)(1).  The term "anything of value" includes an in-kind contribution. 11 C.F.R. § 100.7(a)(1)(iii)(A) (now codified at 11 C.F.R. § 100.52(d)(1)). Providing without charge a good, service, or facility constitutes an in-kind contribution. 11 C.F.R. § 100.52(d)(1).

The Act requires a candidate campaign committee to report to the Commission for disclosure to the public (1) the identity of each person who lends money to the committee during the reporting period, (2) the identity of an endorser or guarantor of the loan, and (3) the date and amount of the loan.  2 U.S.C. § 434(b)(3)(E).  The Act requires a campaign committee to report to the Commission each disbursement, including the repayment of a loan, during the reporting period.  2 U.S.C. § 434(b)(4)(E).

## BACKGROUND

In the 2001 Mid-Year Report, which covers the first six months of 2001, the Committee discloses receipt of three loans from one corporation and three loans from another (FEC 0007-00036, Doc. 41, Ex. 1 ¶ 61).  "Kalogianis & Associates, P.A. Kalogianis, Constantine" lent the committee $10,000, $5,500, and $42,175 and "Liberty

Title Agency, Inc., Kalogianis, Constantine" lent the Committee $500, $200, and $27,000 (FEC 00016-17; FEC 00031-36; Doc. 41, Ex. 1 ¶ 61).

In December, 2001, the Commission notified the Committee that the Committee had received prohibited corporate contributions (Doc. 41, Ex. 1 ¶ 62). On February 13, 2002, Jones notified the Commission that the $10,000 and $5,500 loans from Kalogianis & Associates and the $500 and $200 loans from Liberty Title were "loans from the candidate's corporations" (FEC 00188-189; Doc. 41, Ex. 1 ¶ 75). She further stated that the loans were repaid and that the $42,175 and $27,000 loans were from the candidate (Doc. 41, Ex. 1 ¶ 75-77).

On February 15, 2002, the Kalogianis Committee filed the 2001 Year-End Report for the second six months of 2001 (Doc. 41, Ex. 1 ¶¶ 78-79). The report itemizes the repayment of the $10,000 and $5,500 loans to Kalogianis & Associates but not the repayment of the Liberty Title loans. Jones promised the Commission staff during a February 21, 2002, telephone conference that she would correct the error (FEC 00740), but she failed to do so. Also, Jones told the Commission that the $42,175 and $27,000 loans originated from the corporations (FEC 00740). The Commission directed Jones to refund the money from the Committee to the contributing corporations (FEC 00740) and informed her that the Act prohibited Kalogianis's acting as a conduit for money transferred from a corporation to the Kalogianis Committee.

On March 15, 2002, the Commission again called Jones (Doc. 41, Ex. 1 ¶ 97) to inquire about the $42,000 and $27,000 loans and to insist on resolution by March 31, 2002, of each discrepancy (FEC 00742). Jones reported on March 27, 2002, that the

Committee had "repaid" the original $27,000 loan to Kalogianis (instead of Liberty Title) and that the Committee had received a new loan of $29,000 from Kalogianis. On March 18, 2002, Jones wrote the Commission and promised prompt documentation of the $42,175 loan, but she failed to provide the documentation for three years (long after the Commission initiated an enforcement action) (FEC 00194-95).

On May 10, 2002, the Kalogianis Committee amended the 2001 Mid-Year Report and again changed the identified source of the loans (Doc. 41, Ex. 1 ¶¶ 106-107). The Committee claims with the May 10 iteration of the report that Kalogianis is the source of each of the six loans – loans that the commission months earlier had instructed the Committee to refund to the corporations. The Commission again called Jones regarding the Committee's failure to disclose accurately the source of the loans (Doc. 41, Ex. 1 ¶ 112). More than a year later Jones sent a letter (FEC 00607-608) stating that each of the loans was "personal funds as strictly defined by the Commission Regulations" (Doc. 41, Ex. 1 ¶ 113). In July, 2003, the Committee reported only cash-on-hand and debts (Doc. 41, Ex. 1 ¶¶ 108, 110, 114). Despite repeated requests from the Commission, the Committee failed to file amended and fully accurate disclosures until March 22, 2007, years after the administrative proceeding and after the initiation of this litigation (Doc. 48 at 23). The March 22, 2007, report discloses "Kalogianis and Associates/Chuck Kalogiani[s]," "Libert[y] Title Agency/Chuck Kalogianis," and "Wells Fargo" as the sources of the loans (Doc. 48 at 23).

## THE ADMINISTRATIVE PROCEEDING

The Act authorizes the Commission to initiate an administrative proceeding based upon "information ascertained in the normal course of carrying out its supervisory responsibilities." 2 U.S.C. § 437g(a)(2). In November, 2005, the Commission notified the defendants of the Commission's findings and instituted an enforcement proceeding. Responding by letter on behalf of himself and the other defendants, Kalogianis states that "it would appear that a technical violation of the Act may have occurred approximately four years ago regarding various corporate loans made from corporations in which I was 100% shareholder" (FEC 00636; Doc. 41, Ex. 1 ¶¶ 164-168). Unable to secure an acceptable conciliation agreement with the defendants, the Commission sues (Doc. 1).

## CONCLUSIONS OF LAW

Following extensive discovery each party moves for summary judgment (Docs. 40, 41). The moving party is entitled to judgment as a matter of law absent a genuine issue as to any material fact. Rule 56, Federal Rules of Civil Procedure; Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Of course, not every fact dispute between the litigants defeats summary judgment. "[T]he requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis in original).

### Constitutional Arguments

The parties dispute the constitutionality of Section 441b as applied to the corporate contributions to the Kalogianis Committee. After the summary judgment

briefs, each party submitted (unsolicited) an additional brief (Docs. 63-65) evaluating FEC v. Wisconsin Right to Life, 127 S. Ct. 2652 (2007) ("WRTL"), which addresses independent corporate expenditure and not a corporate contribution to a campaign. The Supreme Court has described a distinction between "expenditures and contributions, treating expenditure restrictions as direct restraints on speech . . . but saying, in effect, that limiting contributions left communication significantly unimpaired." Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 378 (2000) (citing Buckley v. Valeo, 424 U.S. 1, 20-21 (1976)). Thus, the pertinent legal landscape remains unaltered by WRTL.

Austin v. Michigan Chamber of Congress, 494 U.S. 652, 658-59 (2000) explains the constitutional justification for prohibiting corporate contribution:[1]

> State law grants corporations special advantages – such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets – that enhance their ability to attract capital and to deploy their resources in ways that maximize the return on their shareholders' investments. These state-created advantages not only allow corporations to play a dominant role in the Nation's economy, but also permit them to use 'resources amassed in the economic marketplace' to obtain 'an unfair advantage in the political marketplace.'

---

[1] The ruminations in Justice Scalia's WRTL concurrence concerning Austin are inapposite. Justice Scalia's opinion focuses on Austin's application to independent expenditure by a corporation on a campaign advertisement. WRTL, 127 S. Ct. at 2678-79. Justice Scalia did not discuss legislative restriction on direct corporate monetary contribution to a candidate except to note that Buckley "held that [the Act's] *contribution* limitations passed constitutional muster because they represented a 'marginal restriction upon the contributor's ability to engage in free communication,' and were thus subject to a lower level of scrutiny." 127 S. Ct. at 2666 (citing Buckley, 424 U.S. at 20 (emphasis in original)). The remainder of the concurrence focuses on the difficulty of establishing a judicial "test" to differentiate "express advocacy" from "issue advocacy." WRTL, 127 S. Ct. at 2678-85. Further, current precedent controls even if the concurring and dissenting opinions in WRTL evidence with a probability that the Supreme Court will change its stance on the propriety of statutory restrictions on corporate contribution. See U.S. v. Greer, 440 F.3d 1267, 1275 (11th Cir. 2006) ("The problem with lower courts basing decisions on predictions that the Supreme Court will overturn one of its own decisions is that the Supreme Court has repeatedly told us not to do it.").

494 U.S. at 658-59 (quoting FEC v. Massachusetts Citizens For Life, 479 U.S. 238, 257 (1986) ("MCFL")).  "The statute thus reflects a legislative judgment that the special characteristics of the corporate structure require particularly careful regulation."  FEC v. National Right to Work Comm., 459 U.S. 197, 209-10 (1982) ("NRWC").  Section 441b applies to a contribution by a corporation of any kind, including a non-profit corporation (FEC v. Beaumont, 539 U.S. 146 (2003)) and a closely held corporation (Athens Lumber Co., Inc. v. FEC, 531 F. Supp. 756, 758 (M.D. Ga. 1982)).  As the Supreme Court states:

> Although some closely held corporations, just as some publicly held ones, may not have accumulated significant amounts of wealth, they receive from the State the special benefits conferred by the corporate structure and present the potential for distorting the political process.  This potential for distortion justifies [the statute's] applicability to all corporations.

Beaumont, 539 U.S. at 158 (quoting Austin, 494 U.S. at 661).

The defendants argue that a contribution of corporate money by the sole shareholder of a corporation and a contribution by the shareholder of the shareholder's money warrant equivalent treatment because in each instance the contribution is necessarily the shareholder's money.  However, precedent precludes this interpretation of the statute.  Section 441b "reflects a permissible assessment of the dangers posed by [corporations] to the electoral process" and applies equally to "corporations . . . without great resources, as well as those more fortunately situated . . . ."  459 U.S. at 210.  The Supreme Court "accepts Congress's judgment that it is the potential for such influence that demands regulation."  459 U.S. at 210.

Buckley, NRWC, MCFL, Beaumont, Austin, and Athens Lumber proceed from the premise that Section 441b serves the compelling governmental interest in deterring corruption of the political process by corporations and that Section 441b is constitutional as applied to the defendants.

### The Corporate Contributions

No party disputes that the defendants violated Section 441b by effecting the six corporate loans to the Kalogianis campaign (Doc. 40, Ex. 1 ¶ 46; Doc. 40 at 37). Section 441b(a) makes it "unlawful for any . . . corporation . . . to make a contribution or expenditure in connection with any election to political office . . . ." Corporate contributions include a loan in connection with a federal election. 2 U.S.C. § 441b(b)(2). Between January 11, 2001, and March 2, 2001, the corporations lent the campaign $16,200 paid by four payments from interest-free and corporate accounts (Doc. 41, Ex. 1 at 41-46, 60). The defendants submitted a Prudential Financial Client Statement disclosing that the net value of the fifth loan to the Kalogianis Committee was $47,929.58, of which $11,367 originated from Kalogianis & Associates (Doc. 41, Ex. 1 at 48). The sixth loan was an advance from Liberty Title on a $35,000 "BusinessLine" line of credit through Wells Fargo Bank (Doc. 41, Ex. 1 at 50).

No party disputes that the Kalogianis Committee accepted the six loans and that Kalogianis, both as an officer and director of the corporations and as a candidate for federal office, consented to each loan. "The statutory term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense." Bryan v. U.S., 524 U.S. 184, 193 (1998); FEC v. Malenick, 310 F. Supp. 2d 230, 237 n.9 (D.D.C. 2004). That

Kalogianis was both an officer and director of the contributing corporations and the candidate for office accepting each contribution satisfies the "knowledge" component of Section 441b(a). The defendants assert in their summary judgment motion that Kalogianis "has never denied that the campaign violated §441b . . . " (Doc. 40 at 37).

<u>The Use of Corporate Office Space and Furniture</u>

The Act defines a "contribution" as "anything of value." 2 U.S.C. § 441(6)(b)(2); 431(8)(a)(I). Thus, the candidate must pay the "normal charge" for use of a corporate office and corporate office equipment. See <u>Friends of Mike Parker for Cong.</u>, Advisory Opinion 1994 WL 236408 (FEC May 12, 1994) (stating that the phrase "'anything of value' includes the provision of goods and services . . .," including the use of "property and equipment . . . without charge or at less than the usual and normal charge.").[2] In <u>Stupak For Congress</u>, Advisory Opinion 1995 WL 247272 (FEC April 22, 1995), candidate Stupak proposed that his committee rent office space and equipment from the candidate's professional corporation. 1995 WL 247272 at *2-3. The Commission determined that a "campaign committee may . . . rent for campaign use part of an office building owned by the candidate so long as it pays no more than the fair market value." 1995 WL 247272 at *2-3 (citing Commission Regulations on Personal Use of Campaign Funds, Explanation and Justification, 60 Fed. Reg. 7862, 7865 (Feb. 9, 1995)). The Commission stated that "as a corporation, Bart. T. Stupak, P.C., would be prohibited from making any contribution to your committee . . . . Providing use of equipment at

---

[2] The Commission's interpretation of the statute governs if the interpretation incorporates a "'permissible construction of the statute.'" <u>FEC v. Nat'l Rifle Assoc.</u>, 254 F.3d 173, 186-87 (D.D.C. 2001) <u>citing</u> <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 843 (1984).

- 10 -

less than the usual and normal rental charge for such equipment would result in a corporate contribution to your committee [in violation of] 11 CFR 114.1(a)(1)."

The defendants deny the alleged statutory violation because Kalogianis & Associates neither paid rent to a landlord nor charged rent to a tenant for the office space and equipment (Doc. 40, Ex. 1 ¶ 34).  However, Kalogianis & Associates provided the office space and equipment to the Committee at no cost, and "no cost" is undeniably and inescapably less than the "usual and normal rental rate" for office space and equipment.  Because the Committee occupied the space and used the equipment at "no cost," i.e., at a cost below the "usual cost," the defendants violated the Act.

### Injunction/Civil Penalty

Section 437g(a)(6)(B) of the Act provides that:

> [T]he court may grant a permanent or temporary injunction, restraining order, or other order, including a civil penalty which does not exceed the greater of $5,500 or an amount equal to any contribution or expenditure involved in such violation, upon a proper showing that the person involved has committed, or is about to commit . . . a violation of this Act.

The statutory language "'makes clear [that] '[t]he assessment of civil penalties is discretionary.'" FEC v. Friends of Jane Harman, 59 F. Supp. 2d 1046, 1058 (C.D. Cal. 1999) (citing FEC v. Ted Haley Cong. Comm., 852 F.2d 1111, 1116 (9th Cir. 1988)).[3]  In determining the penalty "a district court should consider (1) the good or bad faith of the defendants; (2) the injury to the public; (3) the defendant's ability to pay; and (4) the necessity of vindicating the authority of the responsible federal agency." FEC v. Furgatch, 869 F.2d 1256, 1258 (9th Cir. 1989) (citing U.S. v. Danube Carpet Mills, Inc.,

---

[3] "A court's discretion on civil penalties is reviewed under an abuse of discretion standard." Ted Haley, 852 F.2d at 1116.

- 11 -

737 F. 2d 988, 993 (11th Cir. 1984)).  The Commission seeks civil penalties from the defendants of nearly $300,000 for "making, consenting to, and accepting six prohibited corporate contributions totaling more than $54,000; for making, consenting to, and accepting in-kind corporate contributions; and for falsely reporting the sources of two of the loans and the dates of repayment of two others" (Doc. 49 at 20).  The Commission accuses the defendants of willful misconduct and bad faith (Doc. 41 at 30-31).

The "defendants' state of mind is clearly relevant in assessing the amount of a penalty."  Friends of Jane Harman, 59 F. Supp. 2d at 1058.  The defendants admit violating the letter of the law.  However, the defendants' initial and volitional disclosures of the source of the corporate contributions led to the Commission's inquiry (Doc. 41, Ex. 1 ¶ 61).  Although lacking diligence and accuracy in their reporting, the defendants' conduct evinces no bad faith.  Kalogianis' deposition testimony (Doc. 40, Ex. 5 at 141-142; 178-179) reveals his state of mind:

> I put a lot of money in this race because I wanted to make sure that when I went to Washington, D.C. that nobody owned me, that nobody had control over my votes, that I was going to vote for what was in the best interests of the American people . . . .  Do I regret the way this was done?  Anybody would.  If you're looking at the mountain of trees that have been cut and everything, who wouldn't . . . .
>
> It cannot be said that the errors that the FEC complains of were somehow done on purpose, or knowingly in any way, or in an attempt to circumvent any of the laws.  Quite simply, if I had known at the time that the loans that were made from my own companies – that it was not allowed, I wouldn't have done it.  It's that simple.  Most importantly, notwithstanding the errors, we disclosed the fact that we were making these loans to the FEC . . . .  In other words, we triggered our own inquiry.  That's the irony of this entire situation.  Further, many of the loans made by Kalogianis & Associates/Liberty Title were made from legitimate lines of credit from lending institutions which were then loaned into the campaign . . . .  It could have been just as easy for us to go to the bank and have Kalogianis

>      for Congress borrow those funds, sign on the dotted line, and have them
>      put into the campaign. So I feel that this matter, quite simply, that based
>      on the facts, based on the level of cooperation, it should have been settled
>      a long time ago.

The Commission further contends that Kalogianis' and the other defendants' behavior during the lawsuit justifies a significant monetary penalty (Doc. 49 at 23-24). This argument fails. The "defendants were entitled to have the complicated statutory and regulatory issues in this case determined by a court." Friends of Jane Harman, 59 F. Supp. 2d at 1059 (denying the Commission's contention that the defendants' "'determined resistance' to conciliation" should result in a significant financial penalty). Although the defendants' accounting of the loans as reported to the Commission was not always timely or complete, the defendants were at worst negligent, and their actions demonstrate no bad faith. Admittedly, there is "always harm to the public when [the Act] is violated." FEC v. American Fed'n of State, County and Municipal Employees-P.E.O.P.L.E. Qualified, 1991 WL 241892 (D.D.C. Oct. 31, 1991). Nonetheless, in this instance any injury to the public is remote and circumscribed. Kalogianis, on the other hand, "is owed over $169,000 by his campaign and will never see those funds again" (Doc. 40 at 27). The totality of circumstances since 2002 undoubtedly has impressed forever on Kalogianis both the importance of compliance with the Commission's regulations and the grim consequences of non-compliance. Little more is required.

Weighing these factors, the maximum penalty for each violation is inappropriate. The defendants shall pay a civil penalty of $7,000, equal to $1,000 for each of the six corporate loans and $1,000 for the in-kind contributions accepted by the Committee. See American Fed'n, 1991 WL 241892 at *2 (assessing a reduced civil penalty for each

- 13 -

violation of the Act where the defendants did not act in bad faith); Harman, 59 F. Supp. 2d 1046 at 1059 (assessing no civil penalty given "the absence of any showing that [the] violations were deliberate or that the defendants acted in bad faith.").

Finally, Kalogianis lost the election, the Kalogianis Committee no longer exists, and no indication appears from the record that Kalogianis is likely to violate the Act again. The plaintiff's request for injunctive relief is **DENIED**. See Harman, 59 F. Supp. 2d at 1059 (denying a request for injunctive relief where the "campaign is no longer in existence, and the [representative] is no longer in office.")

## **CONCLUSION**

In sum, each party's motion for summary judgment (Docs. 40, 41) is **GRANTED IN PART AND DENIED IN PART**. The Clerk shall (1) ENTER A JUDGMENT for the plaintiff and against the defendants, jointly and severally, for $7,000 and (2) CLOSE this case.

ORDERED in Tampa, Florida, on November 30, 2007.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE